IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FRANKLIN ELCOCK, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. _____ |
| | ) |
| COMCAST CABLE | ) |
| COMMUNICATIONS, LLC, | ) **JURY TRIAL DEMANDED** |
| a Delaware corporation, | ) |
| COMCAST CORPORATION, | ) |
| a Pennsylvania corporation, | ) |
| COMCAST CABLEVISION OF | ) |
| WILLOW GROVE, | ) |
| a Pennsylvania corporation, | ) |

## COMPLAINT

Franklin Elcock, by and through his undersigned counsel, alleges upon knowledge and belief with respect to himself and his own actions, and upon information and belief with respect to all other matters, as follows:

### I.  SUMMARY

1. This is a case of race discrimination and retaliation against an African-American employee, Franklin Elcock ("Elcock" or "Plaintiff").

### II.  JURISDICTION

2. This action is brought pursuant to this Court's jurisdiction over civil actions arising under the laws of the United States of America; 28 U.S.C. § 1331, 1337, 1343, 2201, and 2202; 42 U.S.C. § 1981 ("Section 1981"), 2000e, *et seq.* ("Title VII"), to remedy discrimination on the basis of race and retaliation. Delaware state law claims are brought pursuant to this Court's supplemental jurisdiction, 28 U.S.C. § 1367.

3. Plaintiff has satisfied the jurisdictional prerequisites under Title VII. Specifically, the Delaware Department of Labor reached a reasonable cause determination based on its finding that Elcock "provided sufficient evidence that he received severe discipline as a consequence of his complaint of

1

discrimination according to Title VII of the Civil Rights Act of 1964, as amended. In addition, [Elcock] has corroborated evidence that he did not receive progressive discipline unlike his comparators who committed more serious company infractions." The case was transferred to the EEOC, which dated its right to sue letter on April 5, 2005, and which Elcock received on April 18, 2005. This suit is hereby filed within ninety days of Plaintiff's receipt of a Notice of Right to Sue from the EEOC.

### III.   VENUE

4.      Venue is proper in this Court under Title VII, 42 U.S.C. § 2000e-5(f)(3), in that the unlawful employment practices alleged herein occurred in this judicial district and the Plaintiff would have continued to work in this judicial district but for the unlawful employment practices complained of herein.

### IV.   PARTIES

5.      Plaintiff Franklin Elcock is an adult African-American, male citizen of the United States and a resident of New Castle County, Delaware.

6.      Defendant Comcast Cable Communications, LLC is a Delaware corporation with operations in the State of Delaware and with more than fifteen employees. Its registered agent is Comcast Capital Corporation, 1201 Market Street #1000, Wilmington, Delaware 19801.

7.      Defendant Comcast Corporation is a Pennsylvania corporation with operations in the State of Delaware with more than fifteen employees.

8.      Defendant Comcast Cablevision of Willow Grove is a Pennsylvania corporation with operations in the State of Delaware with more than fifteen employees.

### V.   FACTS GIVING RISE TO THE ACTION

9.      Beginning on August 12, 2001, Elcock was employed as a Customer Accounts Executive ("CAE") at the Call Center in New Castle County, Delaware, for the Comcast family of companies named as defendants in this suit (collectively "Comcast" or "Defendants"). Elcock's employment was terminated on July 17, 2003. At all times material hereto, Elcock was a diligent, honest, and loyal

employee who always performed his job in an exemplary manner.

10.  In March 2002, Elcock was promoted to Team Leader/Supervisor. As a Team Leader/Supervisor, Elcock was a member of management.

11.  On September 9, 2002, Elcock was selected by Fidel Edwards, Call Center Vice President, to participate as "Team Lead/Supervisor" in a pilot project known as the "ELM Project."

12.  The purpose of the ELM Project was to restructure front line management and to explore the impact of such management structure on Comcast employees.

13.  The ELM Project consisted of eight Team Leads (including two Team Lead/Supervisors, six Team Lead/CAEs) and several Supervisors outside the "Team Leader" designation. As an ELM Team Leader/Supervisor, Elcock remained a member of management, but rather than working separate from CAEs, as non-ELM Supervisors did, he worked alongside CAEs. Elcock served as a liaison between non-management and management employees.

14.  As of September 9, 2002, Elcock's employment came under the supervision of Martin Jones (a Caucasian male), Call Center Manager. Elcock was told by various Comcast employees that Martin Jones treated African-American employees less favorably than Caucasian employees (and some even called him "racist"). Elcock had no experience with Martin Jones and, therefore, formed no immediate opinion on the matter. From his first day in the ELM Project, Elcock faced adverse treatment from Martin Jones because of his race.

15.  Martin Jones provided Elcock with insufficient information regarding his expectations. Specifically, Martin Jones's only work-related instruction to Elcock was to "think outside of the box." Non-minorities in the ELM project whom Martin Jones supervised received more work-related instruction from Martin Jones than did Elcock.

16.  Martin Jones also attempted to deprive Elcock of resources available to other employees. For example, on September 9, 2002, Martin Jones refused to give Elcock keys used to secure confidential documents, which all other managers received. Elcock asked Martin Jones to reconsider his decision, but

3

Martin Jones refused. Edwards soon thereafter overruled Martin Jones and ordered that he provide all ELM project participants with keys. Martin Jones never provided Elcock with an explanation regarding why he denied Elcock keys in the first place.

17.     Martin Jones discouraged Elcock from congregating with other African-American coworkers, but disregarded the congregation of Caucasian employees. Specifically, on October 9, 2002, Martin Jones called Elcock into his office and advised him that he should not spend time at the desk of his former supervisor, Valerie Jones (an African-American female employee unrelated to Martin Jones), because he claimed it created an improper image of selective association. Martin Jones did not clarify the nature of the alleged perceived selectiveness. Elcock advised Martin Jones that his time at Valerie Jones's desk pertained to work-related activities, including her training of Elcock as a supervisor, which was necessary for him to perform his job well. Martin Jones insisted that Elcock nonetheless stop spending time at Valerie Jones's desk. Elcock proffered for Martin Jones's consideration that Comcast employees were less likely to view his association with Valerie Jones as "selective" than they were to view as selective Martin Jones's propensity to meet and associate with certain employees only, i.e., Chris Britt (a Caucasian male), ELM Coach; Brian Kelshaw (a Caucasian male), non-ELM Supervisor; Sherry Murray (a Caucasian female), ELM Coach; Teresa Snead (a Caucasian female), non-ELM Supervisor; and Beverly Riley (a Caucasian female), ELM Supervisor. In response, Martin Jones merely reasserted his position and Elcock agreed to consider perceptions when spending time with Comcast employees.

18.     Martin Jones implied that Elcock's race played a role in the manner in which his work was perceived. Specifically, in early October 2002, Martin Jones commented to Elcock that he must work twice as hard as other ELM Project participants to overcome negative, base-rate perceptions of him. Martin Jones did not state on what basis he thought Elcock started out as disadvantaged, but from the context of his comment, Elcock inferred that Martin Jones implied that Elcock's race negatively impacted perceptions. However, Elcock reserved judgment on the matter, hoping that his inference was incorrect.

19. Later in October, Martin Jones criticized Elcock in general without providing specific examples of work-related issues. Elcock attempted to focus the conversation on work performance, reminded Martin Jones that he challenged him to "think outside of the box," and described ways that he was fulfilling that charge. Martin Jones dismissed Elcock's refocus of the conversation on objective measures and simply stated in the presence of Riley, who also participated in the ELM Project, but not as a Team Lead, that he should "just be more like Riley." Martin Jones did not articulate in what manner he felt Elcock should be like Riley, who was Caucasian, and he provided no specific ways in which Riley's work was objectively of better quality; he merely opined that Riley was better.

20. During the same meeting, and still in the presence of Riley, Martin Jones specifically stated to Elcock that from his point of view, race issues affected their relationship. Elcock stated that race was not a factor to him, stated that race should not be an issue at all, but agreed to continue his efforts to successfully execute his duties as ELM Supervisor.

21. Elcock immediately left Martin Jones's office to complain of Martin Jones's invocation of race as a factor in their relationship.

22. Comcast was unresponsive at first to Elcock's race-based complaint. Elcock raised the matter with Billy Mosley, Comcast's Human Resources Manager, but Mosley directed Elcock to speak with Edwards. On November 9, 2002, Elcock met with Edwards to discuss how race was playing a role in Martin Jones's decision making process (the "November Complaint"), but Edwards merely directed Elcock to "manage the way Martin Jones managed him" and pursued the matter no further.

23. Significantly, at least two prior Comcast employees (Angela Wilson, former Call Center Acting Director of Human Resources, and Barbara Edwards, former Call Center Vice President) were terminated and each alleged in law suits that their employment was terminated for attempting to raise race discrimination issues to the consciousness of Comcast.

24. Following Edwards's advice, Elcock approached Martin Jones in private, stated that he saw no reason why they could not work together without friction, and stated that he would continue to

5

perform his duties as ELM Supervisor in a professional and courteous manner and requested similar treatment.

25.  Martin Jones subsequently attempted to thwart Elcock's access to other Comcast employees who might provide him with non-biased feedback. Specifically, in late November 2002, Elcock began a project in which he solicited feedback from CAEs regarding issues they viewed as obstacles to effective performance. Elcock addressed the issues he could and distributed all responses to the following ELM Project participants: (1) Claire Valenti, Director of Process Improvement; (2) Martin Jones; (3) Riley; and (4) Britt. Elcock received responses from some of the aforementioned participants and gained approval to distribute portions of the responses to the CAEs as proof that their raised issues were being addressed. Valenti specifically told Elcock that she viewed his work as excellent, as it was precisely the type of service Comcast hoped a management liaison might provide. Shortly thereafter, Martin Jones instructed Elcock to filter project results through Britt rather than reporting directly to Valenti. Martin Jones would not give Elcock a reason for his instruction.

26.  As instructed by Edwards (i.e., to manage the way Martin Jones managed him), Elcock asked Valenti if she had an issue with him providing her results of his project directly. Valenti informed Elcock that he should feel free to send results to her directly. In January 2003, Elcock replicated his November project and, as instructed, reported his results to Valenti.

27.  On January 22, 2003, in a one-on-one meeting, Elcock asked Martin Jones about the status of his performance. Martin Jones commented that Elcock should "just keep doing what you are doing."

28.  On February 27, 2003, Comcast conducted a meeting to review the ELM Project. Valentee voiced the success of Elcock's project to all in attendance, including Mark Connor, Vice President.

29.  On March 13, 2003, in another one-on-one meeting, Martin Jones again advised Elcock to keep doing as he was.

30. As instructed, Elcock continued performing as ELM Team Leader/Supervisor. Additionally, on March 24, 2003, Elcock successfully completed an "Effective Supervisor" course (with a B average), which he took voluntarily to continue building his skills. Moreover, on March 27, 2003, Elcock attended a "Change Management Training" meeting. By all objective standards, Elcock was performing well above average.

31. Despite receiving consistent overwhelmingly positive feedback, Martin Jones gave Elcock several unjustifiably low (2.5 out of 4) ratings on his April 2, 2003 review, which was his first formal review. In his review, Martin Jones raised Elcock's race relations as a problem and he further stated to Elcock that his review was adversely affected by Fran Dougherty, Comcast Director, who (according to Martin Jones) stated that Elcock behaved unethically. Elcock challenged the reasonableness of Martin Jones's review and specifically stated that he took issue with Martin Jones raising race as an issue for a second time since October. Martin Jones explained that as far as he was concerned, race was still an issue. Elcock stated that he intended to lodge a complaint.

32. In search of an explanation (other than race bias) for the basis of Martin Jones's low ratings, on April 10, 2003, Elcock asked Dougherty in what manner he perceived his behavior to be unethical. Dougherty informed Elcock that he never claimed that Elcock behaved unethically and stated that he never raised Elcock's ethics as a performance issue. Rather, Dougherty stated that he had no problem with Elcock's performance.

33. On April 11, 2003, Elcock sent Michael Patterson, Human Resources Generalist, an email asking why he, unlike the other participants, had not yet received his certificate of completion from the Effective Supervisor course. Patterson stated that Martin Jones had been given the certificate a week prior for distribution. Later that day, Martin Jones tossed Elcock his certificate without comment. Martin Jones in general gave Elcock a cold shoulder.

34. After receiving Martin Jones's review, considering the previous actions of Martin Jones, and disconfirming the validity of Martin Jones's other explanation for the unjustifiably low review,

Elcock re-initiated his attempt to obtain relief from discrimination through channels internal at Comcast. Accordingly, Elcock drafted a rebuttal to his review that was styled as a complaint regarding Martin Jones's actions and which included the issue of race. On April 14, 2003, Elcock filed his complaint with Mosley, which set forth an explanation of the ways in which he was being treated unfairly (the "April Complaint"). In conjunction with submitting the April Complaint, Elcock orally told Mosley (who transcribed Elcock's comments) that he felt it was inappropriate for Martin Jones to continually make race an issue. Elcock stated that he wanted the matter addressed.

35. Comcast was unresponsive at first to Elcock's April Complaint. Specifically, Elcock sent Mosley emails on May 1, 9, 10, 11, 12, 13, 14, and 29th. Each email went unanswered. In early June, Elcock asked Michael Patterson, Comcast's Human Resources Generalist, what the status was on his complaint. Patterson stated that he did not know, but advised Elcock to send another email to Mosley with an email return receipt. On June 10, 2003, Elcock followed Patterson's advice, received the return receipt, but still received no substantive reply.

36. Beginning less than a week later, Britt sat in on meetings held by Elcock and moved his desk within ear-shot of Elcock's desk. Unbeknownst to Elcock at that time, Comcast began reviewing recorded surveillance of Elcock's telephone conversations.

37. In early July 2003, Elcock's subordinates and peers commented on Britt's surveillance of him and many separately asked whether Comcast was "after him" for something. Although Elcock suspected Britt was acting on the retaliatory orders of Martin Jones, Elcock declined to respond to his colleagues' observations.

38. Elcock attempted to continue performing his job successfully, but Martin Jones persisted in his retaliation and continued to undermine Elcock's work. For example, in July 2003, Elcock made a seating chart for the work area for which he was responsible as manager, which was common practice among managers. Britt subsequently rearranged the work area contrary to Elcock's arrangement. Elcock immediately discussed Britt's action with Geralyn Carney, Scheduling Manager. Carney advised Elcock

that Elcock had the authority to establish seating as he saw fit and Elcock, therefore, re-reassigned seating. Elcock then discussed the matter with Britt who confirmed that Martin Jones told him to rearrange Elcock's seating arrangement.

39. In a further attempt to manage the way Martin Jones managed him, Elcock told Britt that Martin Jones's instructions to Britt were discriminatory in nature and insisted that Britt immediately cease assisting Martin Jones in his acts of discrimination. Elcock immediately thereafter called Martin Jones, told him that he would not stand for Martin Jones's discrimination, and that he would insist on action from Comcast concerning his November and April Complaints.

40. On June 19, 2003, Elcock lodged a third complaint. Specifically, Elcock orally complained to Mosley, enumerated the many instances in which Martin Jones demonstrated racial animus toward Elcock, specified when and how Martin Jones engaged in retaliation, and emphasized that he could not perform his duties in the hostile environment crated by Martin Jones (the "June Complaint"). Elcock demanded an affirmative response.

41. On July 2, 2003, Dougherty met with Elcock and Martin Jones to discuss Elcock's April complaint, but they did not discuss the June Complaint. In context of discussing Elcock's April complaint, race was specifically discussed and Dougherty ended the meeting by stating that he would review Elcock's April complaint. Dougherty added the warning, however, that he did not want race to resurface as an issue. Dougherty did not specify for whom his warning was intended.

42. In response to their meeting with Dougherty, Martin Jones called Elcock into his office and asked Elcock where he wanted to be in five years. Elcock stated that he hoped to be higher in the Comcast organization (i.e., "in corporate"). Messrs. Jones and Elcock both knew that Elcock's participation in the ELM project was important to Elcock's advancement. Martin Jones warned Elcock that he had "friends in corporate" and threatened that if he wanted out of the ELM project, all he had to do was ask.

43. On July 9, 2003, Martin Jones agreed to change one grade on his April 2003 review, but Elcock told Mosley that Martin Jones's revision of his review did not change his conviction to see his claims of discrimination through to resolution.

44. On July 17, 2003 (i.e., approximately two weeks after Jones threatened Elcock and approximately a week after Elcock insisted that Comcast do something about his complaints of discrimination), Comcast terminated Elcock's employment.

45. Comcast's stated reason for Elcock's termination of employment was that Elcock had a conversation with a colleague that contained content of an allegedly lascivious nature. However, Comcast has allowed similar (and worse) conduct on prior occasions without terminating employees' employment.

46. Elcock's employment was adversely affected because of his race. Race was at least a factor in Comcast's treatment of Elcock.

47. Elcock's employment was terminated because Elcock lodged internal complaints of discriminatory treatment due to his race. Termination was an act, at least in part, of retaliation for Elcock's refusal to withdraw his complaints of discrimination.

## COUNT ONE
## VIOLATION OF TITLE VII

48. Elcock repeats and realleges the allegations contained in paragraphs 1 through 47 and incorporates the same as if fully set forth herein.

49. By filing a complaint with Comcast alleging racial discrimination in the manner in which Comcast treated Elcock, Elcock engaged in protected activity under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*

50. Because Elcock engaged in such protected activity, Comcast subjected him to an adverse employment action, including termination.

51. There is a causal connection between Elcock's protected activity and the adverse employment action, in that Comcast responded adversely within days after his complaints, including

10

termination less than 15 days after Comcast met with Elcock to discuss his complaint and less than 8 days after Elcock refused to rescind it.

52.     By treating Elcock in a manner that constituted racial discrimination and retaliating against Elcock based on his good faith opposition to discriminatory practices within Comcast, Comcast violated Title VII, including § 704(a) of Title VII, 42 U.S.C. § 2000e-3(a).

## COUNT TWO
## VIOLATION OF EQUAL RIGHTS UNDER THE LAW

53.     Elcock repeats and realleges the allegations contained in paragraphs 1 through 52 and incorporates the same as if fully set forth herein.

54.     Comcast's termination of Elcock's employment in retaliation for Elcock's opposition to discriminatory treatment violated Elcock's right to make and enforce contracts and his right to the enjoyment of the privileges, terms and conditions of his contractual relationship with Comcast.

55.     The aforementioned actions of Comcast were taken intentionally, maliciously, and/or with a reckless disregard of Elcock's rights.

56.     Such actions of Comcast were a proximate cause of Elcock's suffering, *inter alia*, past, present and future loss of income, and emotional and mental distress and constitute a violation of 42 U.S.C. § 1981 entitling Elcock to remedies and damages, including, but not limited to, compensatory, equitable, and punitive damages as set forth below.

## COUNT THREE
## VIOLATION OF DELAWARE DISCRIMINATION IN EMPLOYMENT ACT

57.     Elcock repeats and realleges the allegations contained in paragraphs 1 through 56 and incorporates the same as if fully set forth herein.

58.     By treating Elcock in a manner that constituted racial discrimination and retaliating against Elcock based on his good faith opposition to discriminatory practices within Comcast, Comcast violated 19 *Del. C.* § 711.

## COUNT FOUR
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

59.     Elcock repeats and realleges the allegations contained in paragraphs 1 through 58 and incorporates the same as if fully set forth herein.

60.     Elcock's employment relationship with Comcast included an implied covenant of good faith and fair dealing.

61.     Comcast, acting by and through its agent, servants and employees, terminated Elcock's employment due to his opposition to Comcast's discriminatory treatment of him.

62.     The actions of Comcast were taken with malice and/or disregard of Elcock's federally protected rights, in that Comcast, through fraud, deceit and misrepresentation, manufactured false grounds to terminate Elcock's employment.

63.     The actions of Comcast were in violation of the public policy of the State of Delaware as set forth in the statutes of this State, which prohibit discrimination and retaliation in employment, 19 *Del. C.* § 701, *et seq.*

64.     The agents of Comcast were acting within the scope of their employment and authority in taking the aforesaid actions against Elcock.

65.     Comcast, rather than conducting an employment relationship in good faith based upon fair dealing, breached the implied covenant of good faith and fair dealing under Delaware law through its actions as described in the foregoing paragraphs, and as a result, breached the employment contract with Elcock causing significant financial injury to him.

**WHEREFORE**, Elcock respectfully requests this Court enter judgment in favor of Elcock and against Comcast as follows:

1.      Declaring the conduct engaged in by Comcast to be in violation of Elcock's rights.

2.      Ordering payment of past, present and future lost wages, bonuses, Stock Purchase Plan Discounts and 401(k) contributions;

3.      Ordering payment for loss of all medical, long term disability, life insurance, visual and

12

dental benefits;

4. Ordering equitable relief, including, but not limited to, future lost income and benefits in lieu of reinstatement ("front-pay"); or, in the alternative, ordering Comcast to rehire Elcock in a comparable position to that held by him prior to his unlawful termination, at Elcock's election;

5. Imposing punitive damages;

6. Awarding attorneys' fees and expert fees pursuant to 42 U.S.C § 1988; 2000e2, 2000e-3 and/or 2000e-5;

7. Awarding costs;

8. Awarding pre and post judgment interest; and

9. Ordering any other relief that the Court deems just and appropriate.

CONNOLLY BOVE LODGE & HUTZ LLP


*[signature: Tim M. Holly]*

Matthew F. Boyer (Del. Bar No. 2564)
Email: Mboyer@cblhlaw.com
Timothy M. Holly (Del. Bar No. 4106)
Email: Tholly@cblhlaw.com
The Nemours Building
1007 N. Orange Street
P.O. Box 2207
Wilmington, DE 19899-2207
(302)-252-4217
*Attorneys for Franklin Elcock*

DATED: June 30, 2005